All right. Ms. Miriam? Good morning, Your Honors. May it please the Court. My name is Darina Miriam and I represent the appellant in this case, Ms. Menzia and her daughter, Zee. And, Your Honors, this is a case about a child who was repeatedly bullied, assaulted, and harassed because of her race and country of origin. The District Court concluded that no reasonable jury could find that the district had been deliberately indifferent in responding to the bullying. Reaching that conclusion, the District Court made two errors. It first applied the wrong legal standard, and second, it improperly resolved multiple factual disputes in favor of the school district. Your Honors, I want to start today by talking about some of the factual disputes that the District Court resolved here because I think that might actually present the most straightforward way to resolve this case on appeal. And I want to go back to September 26, Your Honors, 2017, when Ms. Menzia first reported the harassment to Mr. Lopez, and she told him about the fact that her daughter was repeatedly bullied. She told him that the harassment was of a racial nature, and Mr. Lopez said that he was going to contact the parents of one of the harassers. And what happens next, Your Honors, is subject to disputes, to a dispute between the parties. We don't know if Mr. Lopez actually ended up calling the parents of one of the harassers. And even if he actually did call the parents of the harassers, we don't—what the other side is essentially saying here, Your Honors, is simply attempting to call the parents of one of the harassers amounts to actions sufficient to negate the deliberate indifference liability of the school district. Simply picking up the phone, dialing up a number, not speaking to the parents of the harassers, and then taking any further action to contact the parents of the harassers should not be sufficient to negate the school district's liability for deliberate indifference in this case. Moving on to the next step, so between September 26 and October 13, Zee was subject to more harassment from her bullies, and of course her mental state deteriorated as a result, and she told one of her teachers that she didn't want to give any more. The teacher was a counselor, and the counselor—called the mother—brought her to the school, and Ms. Menzia, again, on October 13, and that was a Friday, spoke with Mr. Lopez and told her that her daughter was still being harassed, and asked Mr. Lopez if he had called the parents. He said, no, Ms. Menzia, I haven't called them, they didn't pick up the phone. Well, then Ms. Menzia asked Mr. Lopez to start an investigation into the case, and Mr. Lopez said he would. And again, what happened after that in the next few days is subject to multiple factual disputes between the parties. So again, Your Honors, this was on October 13, Friday, then you have Saturday, Sunday, Monday, and then on a Tuesday, we have the altercation between Zee and the other girl, which leads to the arrest of Zee, and her daughter is again invited to—her mother is again brought to the school on October 17, that's a Tuesday, and what happens then is that the mother again asks Mr. Lopez, well, Mr. Lopez, did you conduct the investigation? And Mr. Lopez says, yes, I did, and it showed that your daughter is the bully. And then mother asks, well, when did you—Mr. Lopez, then when did you do the investigation? It is—I asked you to do it on Friday. Mr. Lopez says, well, I did it on Friday. Ms. Menzia says, well, by that time, the school had let out. Mr. Lopez then says, well, I did it on Monday, Ms. Menzia, and then the police officer who's there says, well, he couldn't have done it on Monday. He was in training all day. Well, and the other side brings up the affidavit that Ms. De La Garza provided in this lawsuit, but if you look, Your Honors, at page 828 of the record, Ms. De La Garza says on October 17, that's the Tuesday, she spoke with Mr. Lopez, so the principal speaks with the assistant principal, and he told her that he wasn't—wasn't able to effectively investigate. On October 17, that's what he told his principal. Ms. De La Garza, I wasn't able to effectively investigate because mother and daughter didn't give me enough details about the incidents. So you—you're—you're claiming that the school or the district didn't—didn't do enough. Is that right? Your Honor, we're saying that the district—that the school district here didn't do anything that rises to the level—to the statutory minimum that they were supposed to. In your—in your view, what is it that the district did do? I understand that in your answer to that question, you're saying it wasn't enough, that it was still deliberate indifference, but my question is, in your view of the facts, what did the district do? Your Honor, in our view, there—I would say there are probably three things that they did. One is the counseling that they provided to the victim. In our view, Your Honor, the counseling is not sufficient because it does nothing to eliminate or it's not even—it is not even aimed at eliminating the harassment. We're not saying they should have done something to actually stop the harassment. We're saying whatever the school district does, it has to be in the ballpark. It has to be at least someone— All right, you—all right, you—you began answering my question by saying that the district did do the counseling. The counseling, yeah. What else—what else did the district do? They—they also instituted a stay-away agreement on November 17th, Your Honor, but this was after we had all these incidents of harassment, and—and—and this court has said, Your Honor, that—that a delay in providing relief could—could qualify as a libertine indifference. And what else did the district do? You—you—two things now. The other—the other side also brings up the fact that the school district walked back some of the sanctions or some of the disciplinary measures that they took against Zee, and our position on that, Your Honor, is that those were, again, not directed at eliminating the harassment. Those were merely—those were merely accommodations they were providing to Zee, but they in no way, in no form or shape, were aimed at—at stopping or eliminating the harassment here. And, Your Honor, we've looked at a lot of the—a lot of the cases that this court—where this court has found that the school district had done enough and had—had—had negated its liability under the statute. In those cases, you always have a combination of either at least making contact with the school district, talking, reprimanding, warning, and—or, yes, Your Honor? The stay-away agreement was too late in the situation to merit any indifference by us? Yes, Your Honor, and—and I—and I can—and I can explain why that is. Can you do that, please? Yes, Your Honor. So, and I—I just want to—I'm not going to recount the facts. I know Your Honor knows—knows the facts, but I just want to make sure we're on the same page. So, the stay-away agreement was And, Your Honor, that was after you had the—after Ms. Menzia had reported the incidents to Mr. Lopez on September 26th, on October 13th, on October 16th, then she had a meeting with the school on October 17th, then she had the suicide attempt, the daughter attempted suicide, then daughter was in the hospital for Then, in—the record is not quite clear on that, but it seems like daughter came back to the school sometime late in October, early November, and then once she comes back to the school on October—on November 9th, Z, again, reports the harassment, and then between November 14th and November 17th, you have the several incidents—the ball-throwing incident, the perfume-spraying incident, and someone grabbing her hair on the bus. So, the stay-away agreement came at the end of that, Your Honor, and our position is that—that's—so that's 51 days—51 days, Your Honor, after Ms. Menzia first reported the harassment to the school on September 26th. Our position, Your Honor, is the district court should take those changing circumstances into consideration. Even if the stay-away agreement could have been sufficient on day—on day—on September 26th, maybe even October 13th, the court here should have taken into consideration the changing circumstances here, and—and at that time, on November 17th, once you had the suicide attempt, once you had the repeated complaints, the stay-away agreement, with all due respect, was not sufficient at that point, and if that's all that's enough— Why wasn't it sufficient at that point? Your Honor, so this court has said that—that a delay in investigation or a delay in—in—in taking—in taking action, it could constitute delay. At some point, Your Honor, the school has to become liable under the statute. The school cannot claim after four years or six years or multiple months that they finally did something. Here you have multiple incidents of harassment. You have clearly negative—severe negative outcomes for the victim who was— Did the stay-away agreement stop the harassing? Your Honor, we—at that point, we think that the—the stay—we're not—there's no evidence on the record that there was more harassment at the late—in the late—the second part of November, and at that point, Z was also—her transfer request was—was approved, and she moved on to another school, Your Honor. Despite the—the report from Mr. Lopez— Yes, Your Honor. Did Menzie ever receive another report about an investigation? No, Your Honor. So—so what we have in the record is seven or eight months later, there's some follow-up in the record about the investigation, and what happened is it seems like Mr. Lopez hadn't—hadn't completed another report and investigation. In fact, Your Honor, after she came back from the hospital and there were more incidents, we would expect that the school start another investigation, but there was no such—no such investigation initiated, and this is one of those rare cases where the school didn't speak to the parents of the harassers, didn't speak to the harassers, didn't discipline the harassers, didn't separate the students. Well, there's a reference about a letter to Mr. Lopez about a Title IX investigation. And that— When that ever completed, that investigation? Yes, Your Honor, and I believe that—that was in March or April, and I can get you the exact date, but that was the following year. That was multiple months after she was already transferred to the—to another school. Okay. And I just—I—I am running out of time. I quickly just want to spend a few minutes talking about the legal standard here, and for the district court's analysis, yes, it is brief, but this is not the reason why we dispute that it is sufficient. If you look at the analysis of the district court, it simply lists several of the actions that the school district did here, but it never analyzes whether those actions were sufficient in light of the known circumstances, which is a requirement that both this court in Fennell and in Davis has said that the district court should look at. And—and some of the things that we think that the district court should have looked at here is obviously the severity of the harassment, the effects on the victim, but most importantly, the changed circumstances, and this is something that—that I touched on before, something that might have been sufficient on September 26th could be clearly insufficient two months later after the victim has reported multiple incidents of harassment and after she has been in the hospital because of the harassment. At that point, the school, on day one when she came back from the hospital, should have had a plan. We're not saying the school should have done specific things. We're saying do something. Separate students. Discipline the other student. Do something for this child. This child's coming back after multiple days in the hospital, a suicide attempt, and the school had done nothing to ensure that the harassment will not happen, and we're not saying be successful at that. We're saying just try, just do something. The stay-away agreement was two or three weeks after she came back. In all of the cases, there's either some sort of measure that aims at separating the students or something that aims at—something that aims at disciplining the other students, and this was—this was not the case here, and, Your Honors, if you have no further questions, I'd like to reserve the rest of my time for rebuttal. You have saved your five minutes for rebuttal. Thank you, Ms. Miriam. Thank you. Mr. Brush? Good morning, and may it please the Court. Jonathan Brush, along with my co-counsel—excuse me, Amy Dimler, on behalf of the Austin Independent School District. The district court correctly applied this court's precedent to find that the plaintiffs failed to raise a triable question of fact on the deliberate indifference element of their claim. In this court, the appellants are contending that the district court established essentially a per se, any action standard negates deliberate indifference and that that's an improper view of the law. To the contrary, this court cited Fennell, which is this court—I'm sorry, the district court cited Fennell, which is this court's seminal Title VI student-on-student harassment case, and in the Fennell case, this court held that when the school district took some action to address nearly all of the alleged incidents of racial harassment, it was enough to take the right action, to reach the conclusion that a plaintiff wants them to reach, or in fact to stop the harassment. The school district only needs to respond in a manner that's not clearly unreasonable to the known circumstances, and a court looks at the totality of the circumstances. Okay, so if we assume, arguendo, that the stay-away agreement was too late in the bucket, that that constitutes a delay, then how does making a phone call that no one answers enough? Standing alone, making a phone call that no one answers might not be enough. It would depend upon what was known at the time, but it's a step to take action. What the district court never focused on, and what the appellants have never acknowledged in their briefing also, was Mr. Lopez's testimony, and it's uncontroverted, that he had an understanding that the plaintiff and other testified that he would tell them to knock it off. So what we really have is an attempt to make a phone call that went unanswered, and there's no controverting evidence that Mr. Lopez didn't make that attempt. The evidence comes from Ms. Menzia's own testimony. She can't simply say, well... If the credibility of a witness is in question, which I think it is, then that's not something you can grant a summary judgment on. You just listen to the last oral argument where credibility was key. It's not a question of his credibility. It's a question of whether there's any controverting fact to put his credibility into. How can you ever controvert whether I made a phone call no one answered? That's one of those things that you really can't. No. But even if we set that aside, that's not the end of the inquiry. And the error that the magistrate judge made, and that the appellants here repeat, is that they focus on the very beginning of the continuum. And this court's precedent requires a view of the totality of the circumstances. And in the Fennell case, there were instances where the school district failed to respond at all to alleged instances of harassment. And this court found that the school district didn't have to respond to every single incident. But looking at the totality of the circumstances, if the school district's actions were not tantamount to intentionally subjecting the plaintiff to racial discrimination, then the district wasn't deliberately indifferent. Here, we have the phone call. Even if we set the phone call aside for a second, we have Lopez's uncontroverted testimony that he spoke to the other student. That's enough to negate deliberate indifference right there, under this court's precedent, under Fennell. In Fennell, there were instances of racially derogatory terms used, and this court approved of what it characterized as a weak yet sufficient response of talking to the students. Lopez's testimony is uncontroverted. It's never addressed by the plaintiffs, never addressed by the appellants, but it's in the record, it's uncontroverted. That standing alone is enough to negate deliberate indifference. But what else did the school district do on the continuum? The school district was obviously keeping an eye on the student. The teacher reported to the counselor the student's statements about her mental health. The counselor conducted a suiciding screening, contacted the mother. Those steps negate deliberate indifference. They had a conference with the mother. Lopez said he would conduct an investigation. We heard today why the plaintiffs don't believe that Mr. Lopez's statements about the investigation were credible. And yet there is an investigation report in the record. Is it your position that there can never be racial harassment by two people of the same race? No, Your Honor. That can certainly occur. You certainly also understand that you could be the same race, but one person goes all the way back to their great-grandparents in America and the other person just got here from another country. Correct. And that is a difference between people. Correct, and I think that would be a national origin claim. Someone being harassed based upon. Correct. Totally inappropriate. I'm not suggesting I would do that. I'm saying that is done. Absolutely, and that would be a national origin claim in and of itself. Exactly. It's been made here. Correct. We have books. Correct. And regardless of what type of claim, we look at the school district's response to the harassment. Because there was some reference to the fact that these people were the same race, and I thought, well, there's a big difference. First of all, you can be racially discriminated against your same race, but also there's a big difference in how people might act when somebody's from a different country. Not appropriate, but it's done. Correct. And that can be the case. And sometimes it could be harder for a school district to figure out what's going on in some of those exact circumstances. Bear in mind, as this court recognized in Sanchez v. Carrollton ISD, we're talking about students at the very beginning of middle school, 11- and 12-year-olds. And this court recognized that there's conduct that occurs at that level that is completely unacceptable amongst older students and amongst adults, and it's a fact of life. And it happens, and it happens in the middle school environment. It simply happens, and the court recognizes that in terms of having a flexible, deliberate, and different standard when we look at the totality of the circumstances. Mr. Brush, I'm curious about the reports. Once the investigation was taken from Lopez and turned over to Scholes or however you say that name, was a report on that investigation issued? There is a letter report to Ms. Menzia at 833 in the record dated October 17, 2017, from Mr. Lopez, where Mr. Lopez states that he concluded that the bullying... From Lopez. Correct. Right, but then the investigation was turned over to someone else. The investigation, per se, wasn't turned over as much as supervision was turned over to Scholes. Well, whatever. And so the school district assigns assistant principals based on grade, and because it was apparent to the principal that the relationship had, to put it mildly, broken down between the family and Mr. Lopez, she transferred supervision of Z to a different principal. Now, that principal did not conduct any further investigation to pick up Lopez's investigation, but dealt with instances as they arose. So Lopez's finding, which is at 833 in the record, makes the conclusion that there was mutual misconduct. Under this court's precedent, he gets to get it wrong. He can be wrong in his conclusion. He can disbelieve a plaintiff and still not be deliberately indifferent. In Doe v. Dallas Independent School District, this court held that a principal whose investigation failed to determine that one of the staff members was sexually abusing a student still wasn't deliberately indifferent because they took steps to investigate. In Hagen v. Houston Independent School District, a principal's clearly inept investigation, where he gave up on allegations of sexual assault because the plaintiff, the day after telling him he'd been assaulted, said, never mind. This court found that merely initiating an investigation negated deliberate indifference. The school district had Lopez's finding as of October 17th. That conduct up to that point had been investigated, and it's not even necessarily that strange a conclusion that Lopez might have concluded that it was mutual failure to get along. It's undisputed that Z initiated a physical assault on another student. She admitted in her deposition that she started that fight, and she admitted to the investigating officer that she did it not because of any racial bullying but because the other student had referred to her by a slur that begins with the letter B. That's why she started that fight. Given those facts, all of which are undisputed, the school district could reasonably conclude that it was a mutual bullying situation and that the appropriate action was to discipline Z for having committed an assault. And this court in Fennell made clear that a school district can properly punish a purported victim of racial harassment who assaults one of their harassers. And it's not evidence of deliberate indifference to punish a student who commits a physical assault. The school district essentially has to do that. And so Z was going to be sent to the Alternative Learning Center. Why would you have a stay-away agreement at that point if the student, the plaintiff here, who had now assaulted another student, is going to be sent to an alternative campus? I think that answers the question. Why wasn't a stay-away agreement put in place right away? Because they were going to stay away because Z was going to be removed from the campus. So there would be no need for a stay-away agreement. Now, the evidence is a little unclear in the record, but Ms. Menzia kept Z out of school for some period of time. First, she was in a mental health facility after she made an attempt on herself, on her life, and then she kept her out for some additional period of time. So what we have, what's before the school district, what the school district is perceiving and reacting to, is a student who had made a report of harassment, an assistant principal whose undisputed testimony is that he talked to the harasser, told him to knock it off. You have an altercation, the removal of the purported victim, who returns to school. And in that time period after she returns to school, my colleague identified several instances that occurred. There was a ball throwing, perfume spraying. In each of those instances, and this is in the record, Scholz investigated those instances of misconduct. And during her deposition, Z admitted that it was appropriate for Scholz to get both sides of the story, to investigate, that she talked to her about them. Each of those steps constitutes an investigation and a response. Scholz ultimately executed a stay-away agreement, which is a textbook response in these sorts of circumstances. So Scholz responded. She responded with steps that this court has held previously are more than sufficient to negate deliberate indifference. Above and beyond that, as the district court noted, a response would be removing Lopez from the student's supervision, which the school district did. The school district offered counseling services. All of these are classic responses to bullying and harassment that this court has time and time again said negate a finding of deliberate indifference. The irony here is that plaintiffs claim that Judge Yackel applied an improper standard, but what they're doing is applying a proper legal standard themselves by focusing primarily on two discrete instances, the phone call and the sufficiency of the investigation report, and ignoring the totality of the circumstances. If the court were to look only at those instances that occur at the beginning of the continuum, the court is not properly applying Fennel, which requires a view of every step during the interaction. And then an assessment of whether the school district's response, taken in total, is tantamount to the school district intentionally subjecting the plaintiff to racial discrimination. The evidence would not support that conclusion here. And Judge Yackel sustained the district's objection to the magistrate's report and recommendation because the magistrate improperly stopped the analysis at the question of an unreturned phone call and didn't look at everything else the school district did and didn't account for Lopez's undisputed testimony that he had spoken to both Zee and the other students and told them to knock it off. Maybe it's not the strongest response, but it doesn't have to be the perfect response. The deliberate indifference standard requires something above gross negligence and something below intent. And time and time again, this court has held that school districts that make an effort and make some effort avoid a finding of deliberate indifference, and that recognizes the practical reality that each of these campuses has hundreds or thousands of children in them and that they are children. And they do bad things, they do foolish things, they do things that are not acceptable in adult society, and the school district has to have a flexible way to respond, and the school district can make determinations about conduct that may be wrong. Maybe they get the wrong result, but they're still not deliberately indifferent. This court in Sanchez rejected the similar allegations about the investigation that are made in this case. Here, the plaintiffs claim that the investigation couldn't have been done, couldn't have been thorough enough, or reached the wrong result. Even if we assume that Lopez didn't do the investigation on the 13th or on the 16th, it's dated the 17th. And what had happened on the 17th, and what had Lopez been involved in? He was investigating Z's assault on another student. He had facts. He had information with which he could have concluded that investigation on that day. And this court in Sanchez rejected the notion that because an investigation looks cursory or because the plaintiff disagrees with the conclusion, or if they just got it wrong, that that's sufficient to show deliberate indifference. Here, there is not enough evidence to create a triable question of fact on the deliberate indifference element. Judge Yackel properly applied this court's precedent. He didn't construct a new rule of law, and he did not employ an incorrect legal standard. He looked at all of the evidence, looked at the totality of the circumstances, and applying this court's precedent, primarily Fennell, which involved a multi-years-long series of racial harassment, to find that even weak responses can escape a finding of deliberate indifference. And in Fennell, the conduct spanned years, and the school district wasn't able to stop it. The conduct involved the placement of nooses. The conduct involved fights. The conduct involved racial slurs. And the school district never stopped it. But both the district court and this court found that the school district's efforts, its responses, were sufficient to defeat a finding of deliberate indifference. Fennell's the seminal case. Applying Fennell to this case, using the appropriate analytical lens, which is looking at the totality of the circumstances from that first report to Lopez on September 26th until the time that Z transfers out of Martin Middle School, the school district responded. And it responded with sufficient steps to avoid a finding of deliberate indifference. And even at the end of the continuum, granting the transfer request is evidence of a lack of deliberate indifference. It allowed the student to move to another school to which she was not zoned. And, of course, the evidence from her deposition was that she never had any other problems and she's a normal, happy high schooler. That's the opposite of deliberate indifference. The school district responded. It responded appropriately. And that's sufficient to negate a finding of deliberate indifference. To that end, the second point, Judge Yackel did not make credibility determinations or weigh the evidence. He looked at the undisputed evidence in its totality and determined that there was no triable issue of fact. And even in his brief opinion... Did he make a finding regarding whether that telephone call was made? He did not. No. And even if we assume the telephone call was never made, looking at the totality of the circumstances, the school district would still avoid any fact question on deliberate indifference because of its other responses. But, no, Judge Yackel did not make a conclusion that this happened. Now, what is the state of the evidence? The evidence of the phone call is Ms. Menzia's own testimony where she said, he told me he made a phone call. That's the state of the evidence. Three years later when he was deposed, Lopez, who had no longer worked for the school district, did not have much recollection of his investigation or the essentially two weeks that he was interacting with this family, three years prior. The alternative school that she was transferred to, what does that mean? Who are the other students? What is it alternative to? So, I'll certainly answer the question. She ultimately never went to the alternative school because her mother kept her away, and then the district walked back some of the discipline. But an alternative school under Texas law is a placement that is typically run by the school district. The record is silent here how Austin ISD does it, but as a matter of Texas law, the alternative school is simply a school that students who have had disciplinary consequences issued are sent to. They receive the normal curriculum. They receive their regular instruction and support. It's just in a different physical location. And that's distinct from under the law, say a juvenile justice alternative education program, which is where students who have been convicted of certain criminal offenses are sent. So, an alternative learning center is not an expulsion or a suspension in the sense that we traditionally would think of where if a student was suspended, they were out of school for some period of days or expelled. It's simply a different placement. It's a disciplinary placement, but the regular educational offering is given. So she would have been continuing to receive her education while she was at the alternative learning center. With that, Judge Yackel properly applied this court's precedent, Fennell. If this court looks at Fennell, I think the court will see many of the same responses. The court will see instances where Marion ISD didn't respond to incidents, and the court still found that there was no deliberate indifference or no fact question on deliberate indifference. The same result should obtain here because Judge Yackel properly applied this court's legal authority and precedent, and Judge Yackel did not make credibility determinations. And even if the court were to determine that Judge Yackel had improperly made a credibility determination or weighed the evidence with respect to the phone call or with respect to the date on which he conducted his investigation, the district still took enough steps that even if the court were to throw those two out of the analysis, under this court's precedent, the district would still avoid a finding of deliberate indifference because of the other steps it took. And those are the only two bases of error that the plaintiffs asserted in their brief. Improper legal standard and credibility determinations and weighing the evidence. And neither of them is correct. The right legal standard was used and the court didn't weigh the credibility of the evidence. For those reasons, this court should affirm the district court's final judgment in favor of the school district. Thank you. Thank you, Mr. Brush. Ms. Miriam? Thank you, Your Honor. I'm interested in what you do with the Sanchez case since I wrote that opinion. I'm just wondering how you deal with that. Yes, Your Honor. And so I'll start with Sanchez then. That's what the disgruntled cheerleader mom case. But in that case, what happened was that the school did take statements after each of the reported events in Sanchez. It spoke to the harasser and the mother about her conduct and it also removed the harasser from the classes where the victim was present. So again, Your Honor, the school made contact with the victim and her parents and also separated the students from each other. In this case, and you'll see the same thing in Fennell, Your Honor, so my colleague on the other side heavily relies on Fennell, but if you look at Fennell, what the school did there for racial name-calling, what the school did there was it disciplined the students who had used the N-words, it contacted their parents, it cooperated with the investigations of the DOJ and the police, and it also reprimanded the students in class and ordered them to run laps. This court, all of those responses, what this court said was those responses are weak, they're concerning, but they're not sufficient to negate a finding of, they're not sufficient to subject the school to deliberate indifference. So if actually contacting the parents of the harassing student and if actually reprimanding those students are weak, borderline responses, but still sufficient to exempt the school from liability, not contacting the parents, not disciplining the students, not reprimanding them, not even making contact with the alleged harassers, how could that be considered any response at all, Your Honors? How many harassers were there? There were seven or eight harassers, Your Honor. And I just want to go to, I want to make, what the school district is pointing to here, all the way up to the stay-away agreement, Your Honors, none of those responses was actually aimed at eliminating the harassment. None of those responses. Your Honors, if you look at the deposition of Mr. Lopez, he remembers nothing about the racial name-calling. In his opinion, this was just a mutual dislike between the two students. Then you look at the report, page 833, nothing in the report suggests that the school was addressing the racial harassment. Then you look at the affidavit by Principal De La Garza, page 828, nothing in her affidavit suggests that Mr. Lopez was investigating incidents of racial harassment. How do you respond to your opponent saying that, you know, Lopez told the harassers to knock it off, y'all stop doing this, and so that's some evidence of doing something? Your Honors, if you go back to the deposition where Mr. Lopez said that, it was clearly said in the context of him also saying that he believed the students mutually disliked each other. It was said that when he was asked if he remembered that the students calling each, that there was racial name-calling, Mr. Lopez said he didn't remember that. So how could he possibly address that in talking to the students if he did not remember there was any racial name-calling? There is no record, there is no evidence in the record up until the stay-away agreement that the school district did anything to discipline, warn, reprimand, speak to the harassers, or separate the students in order to stop the racial harassment. And then how do you respond to, you know, you had said the 51 days up to the stay-away, but your opponent pointed out that part of those days Zee was at home or not in school. How do you respond to that? Your Honor, the fact that Zee was spending some time at home actually should have given the school district more time to respond to the harassment. She came back, again, it was sometime at the end of October, beginning of November. The stay-away agreement was not instituted until November 17th. At that point, you had multiple reports by NMATR about escalating violence and harassment. The school district should have had some type of a plan on day one when she returned, and they did not have that. And, Your Honor, IFB-Louisville is the case which said that a delayed investigation or responding could constitute deliberate indifference. And, Your Honor, I see I'm running out of time, so I don't know if Your Honors have any other questions, but what I would say is that this case would significantly expend the presence where this court has found that the school district has not committed or has not acted with deliberate indifference. And with this, I ask the court to reverse the decision below. Thank you, Your Honors. All right, thank you, Ms. Miriam. Your case is under submission, and the court will take a brief break.